**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Clifford Steven Whitney, Jr.,

        Movant,

v.

United States of America,

        Respondent.

No. CR-16-01789-TUC-JGZ (EJM)
No. CV-18-00618-TUC-JGZ

**ORDER**

On May 25, 2017, a jury found Movant Clifford Steven Whitney, Jr. guilty of conspiracy to possess with intent to distribute 50 kilograms or more of marijuana in violation of 21 U.S.C. § 846, and possession with intent to distribute 50 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (CR Doc. 8 at 1-2; CR Doc. 86.)[1] On August 4, 2017, the Court sentenced Whitney to 33 months on each count with the terms to run concurrently, followed by three years of supervised release. (CR Doc. 86.)

Now pending before the Court is Whitney's Motion to Vacate, Set Aside, or Correct Judgment and Sentence pursuant to 28 U.S.C. § 2255. (CV Doc. 1-2.) In his Motion, Whitney asserts claims of ineffective assistance of trial and appellate counsel. The Government filed a response to Whitney's motion. (CV Doc. 12.)

Upon consideration of the record and the parties' briefing, the Court will deny the

---

[1] Citations to "CV Doc." refer to the docket entries in the civil case, CV-18-00618-TUC-JGZ. Citations to "CR Doc." refer to the underlying conspiracy to possess with intent to distribute marijuana and possession with intent to distribute marijuana case, CR-16-01789-TUC-JGZ. Citations to the transcripts can be found in the underlying criminal case.

motion and request for evidentiary hearing.

**I.     Evidence Introduced at Trial**

Whitney's trial started on May 23, 2017.  At trial, U.S. Border Patrol Agent Frank Agudio testified that on August 22, 2016, he was on duty at the State Route 80 checkpoint, which is located just north of State Route 80's intersection with State Route 82. (RT 05/23/17 at 36, 49-53.) He explained that there are two lanes of traffic on Route 80 approaching the checkpoint—a lane that continues straight on State Route 80 through the checkpoint and a left turn lane to turn onto State Route 82. (RT 05/23/17 at 46.) The turning lane lasts for approximately a quarter of a mile. (RT 05/23/17 at 53.) There is also a sign alerting drivers to the State Route 82 intersection. (RT 05/23/17 at 46.)

At approximately 5:30 p.m., Agent Agudio, who was in his U.S. Border Patrol uniform, was working in the checkpoint's preprimary area with his canine partner when he saw a silver Toyota Tundra driving north on State Route 80 in his direction. (RT 05/23/17 at 50, 53-54, 56-57.) The truck, which was later determined to be driven by Whitney, was in the lane to continue straight on State Route 80 into the checkpoint. (RT 05/23/17 at 57-58.) Agent Agudio made eye contact with the driver when he was approximately 20 to 25 yards away. (RT 05/23/17 at 58-59.) Based on his experience, Agent Agudio thought the driver noticed him when the driver turned left from State Route 80 onto State Route 82 from the right-hand lane, the lane to continue straight, rather than from the left turn lane, despite the sign warning of the intersection. (RT 05/23/17 at 46, 58-59.) Agent Agudio characterized the turn as "abrupt." (RT 05/23/17 61.) Agent Agudio found the driver's actions suspicious, and asked U.S. Border Patrol Agent Ian Elich to pursue and investigate the vehicle. (RT 05/23/17 at 61.)

Agent Elich left the State Route 80 checkpoint in his marked Border Patrol vehicle and got behind the vehicle, which was now traveling west on State Route 82. (RT 05/24/17 at 27.) Whitney braked abruptly and slowed down when Agent Elich caught up to him. (RT 05/24/17 at 28.) Because of the tinting on the "rear windshield" of Whitney's truck, Agent Elich was unable to see into the vehicle, so he moved into the other lane to try to drive

alongside Whitney. (RT 05/24/17 at 29.) As he did so, Whitney slowed down further so that Agent Elich's vehicle moved in front. (RT 05/24/17 at 29-30.) Once Agent Elich was in front, Whitney continued to decrease his speed to several car lengths behind Agent Elich, to the point where Agent Elich was no longer using the accelerator. (RT 05/24/17 at 30.) Agent Elich then pulled over on the side of the road to allow Whitney to pass him. (RT 05/24/17 at 31.) Once he passed, Agent Elich began to follow the truck again. (RT 05/24/17 at 33.)

At the intersection of State Route 82 and State Route 90, Whitney turned northbound onto State Route 90. (RT 05/24/17 at 33.) As Whitney turned onto State Route 90, Agent Elich, who was two to three car lengths behind Whitney, activated his emergency lights and siren. (RT 05/24/17 at 33-34, 50.) Whitney did not apply his brake and continued approximately another mile before pulling over. (RT 05/24/17 at 34.) Agent Elich estimated that two to three minutes passed before Whitney pulled over; Agent Elich identified three other places that Whitney could have stopped. (RT 05/24/17 at 35.)

Once stopped, Agent Elich approached the driver's side of Whitney's truck. (RT 05/24/17 at 36.) He did not see anything in the bed of the truck, and he recalled that the tailgate was intact. (RT 05/24/17 at 36.) When Whitney rolled down his window, Agent Elich smelled "a very strong smell of an aerosol air cleaner." (RT 05/24/17 at 37.) He said the smell was "enough for me to pull my head away and have to blink, and it burned my nostrils." (RT 05/24/17 at 38.) Agent Elich said that he saw an aerosol can in the vehicle, but that he did not collect it. (RT 05/24/17 51, 53.) U.S. Border Patrol Agent Sergio Morando, who arrived on the scene after Elich, also saw the aerosol can in the driver's side front-door compartment. (RT 05/24/17 at 81.) He described the can as "white and light blue or a combination of both." (RT 05/24/17 at 81.) At trial, Whitney denied having a can of air freshener with him, and noted the agents' failure to seize any can. (RT 5/24/17 at 51, RT 05/25/17 at 37, 49-50, 114.)

Inside of the cab of the truck, Agent Elich saw unlabeled boxes stacked in the front and rear seats. (RT 05/24/17 at 37, 39.) Whitney told Agent Elich that he was a courier, the

boxes were "returns," and he was coming from Douglas and traveling to his brother-in-law's house in Sierra Vista. (RT 05/24/17 at 39, 41.) Agent Elich asked Whitney if he knew the address for his brother-in-law's house, and Whitney said he did not. (RT 05/24/17 at 42.)  Whitney testified at trial that he told Agent Elich that he was going to Sierra Vista rather than Whetstone, where his brother-in-law lived, because people get confused about where Whetstone is located. (RT 05/25/17 at 47.)

U.S. Border Patrol Agent Michael Consavage arrived on scene and also began talking to Whitney. (RT 05/24/17 at 42.) Agent Elich heard Whitney tell Agent Consavage that he was on his way to Tucson, which was different than what Whitney had told Agent Elich. (RT 05/24/17 at 42.)

Agent Elich asked Whitney if he had manifests for the boxes. (RT 05/24/17 at 42-43.) Whitney said that he did and began searching in the center console of his truck, although later Whitney stated he didn't have a manifest. (RT 05/24/17 at 43; RT 05/25/17 at 74.) Agent Elich saw Whitney's hands as he was searching and noticed that his hands were shaking. (RT 05/24/17 at 43.) Agent Elich testified that Whitney handed him a piece of paper that was a title for a vehicle and that his "hand was shaking a great deal," though Whitney disputes that he showed Agent Elich a vehicle title. (RT 05/24/17 at 43-44; RT 05/25/17 at 53.) Agent Elich asked Whitney again if he had manifests for the boxes. (RT 05/24/17 at 45.) After searching again for a few seconds, Whitney said that he did not have the manifest, but that his brother-in-law might have it. (RT 05/24/17 at 45.)

Agent Morando was called to assist Agent Elich with a canine search at the stop. (RT 05/24/17 at 65.) At the time of the call, Agent Morando was observing traffic on State Route 90; he testified that the State Route 90 checkpoint had closed around 2:30 p.m. that day. (RT 05/24/17 at 65.) When Agent Morando arrived, he asked Whitney for permission to conduct a free air sniff of Whitney's truck with Morando's canine, and Whitney consented. (RT 05/24/17 at 67-68.) The canine alerted at the rear of the truck and on the driver's side. (RT 05/24/17 at 69.) Agent Morando removed the boxes from Whitney's truck and his canine alerted to each box. (RT 05/24/17 at 74.) He asked Whitney for

- 4 -

permission to open the boxes that were taped closed, but Whitney said he did not have authority to grant permission because his brother-in-law owned the company. (RT 05/24/17 at 71, 74.) Agent Morando asked Whitney if he had a manifest for the unlabeled boxes. (RT 05/24/17 at 76.) Whitney said that his brother-in-law had the manifest. (RT 05/24/17 at 77.) When Agent Morando asked Whitney about the boxes, he noticed that Whitney's demeanor changed and that Whitney "tensed up." (RT 05/24/17 at 79.) Agent Morando testified that by the time of arrest, Whitney did not seem shocked or confused, but "[h]e had a very defeated look to him." (RT 5/24/17 at 79-81.)

Agent Morando eventually opened the boxes. (RT 05/24/17 at 77.) The boxes contained 348 individually wrapped bricks of marijuana. (RT 05/24/17 at 86.) The total weight of the packaged marijuana was 381.8 lbs. (RT 05/24/17 at 86.) The total estimated value of the marijuana was between $150,000 to $200,000. (RT 05/24/17 at 138.)

At trial, the Government called Michael Garbo, a special agent with the Drug Enforcement Administration, as an expert witness on drug trafficking organizations. (RT 05/24/17 at 102.) Agent Garbo testified as to how drug trafficking organizations smuggle marijuana from Mexico into the United States, including the use of load drivers. (RT 05/24/17 at 113-130.) He further explained how organizations will typically communicate with load drivers about checkpoints and the presence of law enforcement using cheap phones. (RT 05/24/17 at 124-126, 129.)

When Whitney was arrested, there were two phones in his truck, his personal phone and a flip phone. (RT 5/25/17 49-50.) At trial, Whitney testified that the flip phone was never used for his courier business, and that it belonged to his son who played with it by pushing buttons and talking on it. (RT 05/25/17 at 50, 65.)

Agent Garbo also explained some of the measures that drug trafficking organizations take to make detection by law enforcement more difficult, including concealing drugs in vehicles. (RT 05/24/17 at 126.) He testified that heat makes the smell of marijuana more pungent, but if the marijuana is kept in "some type of air-conditioned vehicle, it keeps the odor down"—a possible explanation for Whitney's decision to load

1   the boxes into the cab, rather than the bed of the truck. (RT 05/24/17 at 134-35.)

2        On the third day of trial, Whitney testified that at the time of the underlying offenses,

3   he was employed as a delivery driver by his brother-in-law, Eduardo Ortiz, at Jam'n Daily

4   Delivery, and that he provided delivery services within Tucson. (RT 05/25/17 at 20-21,

5   29.)   He explained that on August 22, 2016, he was covering Ortiz's delivery route, and

6   he started his day by driving his truck on I-10 and State Route 90 to Ortiz's house in

7   Whetstone. (RT 05/25/17 at 29-31.) Whitney testified that there is a Border Patrol

8   checkpoint on State Route 90, though he could not tell whether it was open or closed when

9   he passed it. (RT 05/25/17 at 30-31.) Whitney arrived at Ortiz's house and picked up a

10  vehicle title that Ortiz wanted him to take to Douglas for a signature. (RT 05/25/17 at 30-

11  31.) Whitney was also to pick up some "returned items" in Douglas, a U.S.–Mexico border

12  town, and take them back to Oritz's house. (RT 05/25/17 at 31-32.) After stopping at

13  Ortiz's house, Whitney continued to Sierra Vista where he made a delivery and then

14  proceeded to Douglas. (RT 05/25/17 at 32.)

15       Once in Douglas, Whitney obtained the signature and then proceeded to a company

16  to pick up the "returned items." (RT 05/25/17 at 32.) However, Whitney could not recall

17  the name or address of the place where he stopped, despite being given the address by Ortiz

18  and entering it into a GPS to get there. (RT 05/25/17 at 32, 54-55.) When Whitney arrived

19  at the location of the returns, he was directed to pull around to a side entrance where an

20  employee helped him load the boxes into the cab of his truck via the driver's side rear door.

21  (RT 05/25/17 at 33-34.) Whitney did not have a manifest or any other paperwork for the

22  boxes. (RT 5/25/17 at 51-52, 55-56.) He testified that the paperwork was "between the two

23  companies, which we pick up, take the paperwork, and drop off along with the items we

24  deliver." (RT 5/25/17 at 52.) For returned items, Whitney said, "[W]e do ask that we get

25  that sheet back or a copy of it to come back," but Whitney said that because he was covering

26  Ortiz's route, Ortiz had the manifest. (RT 5/25/17 at 74.)

27       After the nine boxes were loaded into Whitney's truck, he left Douglas to deliver

28  the boxes to Ortiz's house. (RT 05/25/17 at 35.) Whitney testified that he took the route

that he typically used to get to Ortiz's house, which was taking State Route 80 through Tombstone then making a left onto State Route 82 and then a right onto State Route 90. (RT 05/25/17 at 35.) He said he took this route because it seemed faster and if you go an alternative way, you have to drive slowly through other towns. (RT 5/25/17 at 75.)

Whitney testified that he did not pull over immediately when Agent Elich turned on his emergency lights and siren because of the speed limit on the road and because he would have needed to slam on his brakes to make an earlier turn. (RT 05/25/17 at 37, 42.) He acknowledged that he could have pulled over on the side of State Route 90, but explained that he did not do so because of traffic. (RT 05/25/17 at 42.) During cross-examination, Whitney denied that the reason he didn't stop immediately was because he was spraying air freshener in the cab of his truck. (RT 05/25/17 at 49.) He denied having a can of air freshener with him. (RT 05/25/17 at 49-50.)

During Whitney's re-direct, defense counsel moved to admit two photographs of Whitney's truck that Whitney had taken the day before. One photograph showed two dents on the tailgate of Whitney's truck. (RT 05/25/17 at 61-62; Ex. 101.) Whitney testified that the photograph depicted the condition that his truck was in on the day of his arrest. (RT 05/25/17 at 5, 61-64, 66.) When defense counsel asked him what the photograph showed, Whitney said it "depicts the whole tailgate and shows the damage that is on the tailgate, which kind of the latches don't always hold." (RT 05/25/17 at 62.) When asked if his tailgate was operational, Whitney said, "It is, but if something heavy did hit it, it could pop it open." (RT 05/25/17 at 77-78.) A juror asked Whitney, through submission of a written question, why he didn't load the cargo into the bed of his truck. Whitney responded that one reason was that "[t]he dents in the back, when you put a lot of weight, if they were to shift to the back, it could possibly open my tailgate." (RT 05/25/17 at 76.) On follow-up questioning from the Government, Whitney testified that the damage to the tailgate occurred in March of 2016; he had not yet fixed the tailgate, nine months later; and he continued to use the truck to make deliveries of heavy items. (RT 05/25/17 at 77-84.) When asked how he could do his job as a courier, transporting heavy things, with a

defective tailgate, Whitney responded that if he was transporting something heavy "like a transmission or an engine, [he] had a tire that could be placed in and strapped to the side so that it doesn't shift around or move around." (RT 05/25/17 at 78.)

The second photograph, Exhibit 102, showed Whitney sitting in the driver's seat of his truck.  Whitney testified that the picture was taken to show the tinting on his truck's windows.  Whitney explained that the photo showed that nobody [presumably including the agent] would have been able to see through the back window of the truck because of the window tinting.  (RT 05/25/17 at 63-68.)  In response to the Government's suggestion that Whitney had staged the photograph, Whitney responded: "I was making it as if I was driving, as relevant to the case."  (RT 05/25/17 at 67.)

Because the photographs were late-disclosed and first introduced during Whitney's re-direct examination, the Court allowed the Government to question Whitney about the new evidence.  The Government asked, "Nine months after your arrest. That is not the way your truck looked on the day in question, is it? . . . You put those dents there, did you not? . . . What you're doing is you're fabricating evidence; isn't that true?" (RT 05/25/17 at 66-67.) Whitney responded that he did not and that it wasn't true. (RT 05/25/17 at 66-67.) During closing argument, the Government referred to the photographs, stating, "Staged photographs, staged photographs, think about that and let that sink in. Here in a court of law, under oath, staged photographs." (RT 05/25/17 at 99.)

The Government called Agent Agudio in rebuttal. He testified that the fastest route from Douglas to Whetstone was Highway 80 to the 92 bypass into Sierra Vista and then to 90. (RT 05/25/17 at 79.) He said he confirmed this route was fastest via Google Maps. (RT 05/25/17 at 79-80.) The Government also called Agent Elich on rebuttal, who testified that he did not notice any damage to Whitney's tailgate. (RT 05/25/17 at 82.)

## II.   Section 2255 Standard

Under 28 U.S.C. § 2255, a prisoner may move the sentencing court to vacate, set aside, or correct a sentence if the sentence was imposed in violation of the United States Constitution or laws of the United States, was in excess of the maximum authorized by

law, is otherwise subject to collateral attack, or if the sentencing court was without jurisdiction. 28 U.S.C. § 2255(a). A petitioner is entitled to an evidentiary hearing on a § 2255 motion "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Id.* at § 2255(b).

### III.   Discussion

In Ground One of his motion, Whitney asserts that his trial counsel was ineffective in (1) failing to investigate and present evidence on exculpatory evidence relating to whether he knowingly possessed marijuana; (2) failing to investigate, evaluate, or present a defense of third-party culpability; (3) failing to object to, or move for a mistrial or other relief, based on prosecutorial misconduct; and (4) failing to adequately prepare for trial and advocate for him. (CV Doc. 1-2 at 5-6.) In Ground Two, Whitney asserts that his appellate counsel was ineffective in failing to pursue on appeal the instances of alleged prosecutorial misconduct. (CV Doc. 1-2 at 6.)

### A.   Ineffective Assistance of Trial Counsel

Criminal defendants are entitled to effective assistance of counsel under the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 684-85. To prove ineffective assistance of counsel, a defendant must demonstrate: (1) that counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. *Id.* at 687. There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. To prove deficient performance, the movant must show that counsel made errors so serious that performance fell below an objective standard of reasonableness under prevailing professional norms." *Mak v. Blodgett*, 970 F.2d 614, 618 (9th Cir. 1992) (citing *Strickland*, 466 U.S. at 688). To prove prejudice, the movant must "show there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Because the defendant must prove both deficiency and prejudice, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697.

1       **1. Failure to Investigate and Present Evidence Relating to Whitney's**
2          **Knowledge of the Marijuana**

3          Whitney asserts that trial counsel failed to challenge and investigate the
4     Government's circumstantial evidence that Whitney knowingly transported marijuana.
5     According to Whitney, this includes evidence of: (a) "[Whitney's] choice of route, which
6     was not, contrary to the Government's assertion, materially slower than alternate routes;
7     (b) damage to the truck's tailgate, which was why the boxes were in the cab of the truck
8     instead of the bed[;] (c) the flip-phone found in the truck, investigation of which—or
9     attention to the Government's disclosure regarding it—would have revealed no recent use,
10    thereby refuting the Government's allegation that it was an inculpatory 'burner phone';
11    and (d) the alleged air-freshener can purportedly found in Whitney's truck, which the
12    Government argued was used to mask the scent of the marijuana, but whose existence was
13    disputed and undocumented."  (CV Doc. 1-2 at 5-6.)  Whitney argues that each of these
14    areas of evidence was vulnerable to attack by defense counsel, which would have had the
15    cumulative effect of undermining the Government's case. (CV Doc. 1-2 at 8.)

16         "It is well established that 'counsel has a duty to make reasonable investigation or
17    to make a reasonable decision that makes particular investigations unnecessary.'" *Avila v.*
18    *Galaza*, 297 F.3d 911, 918 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691). However,
19    claims of ineffective assistance of counsel that are based on a duty to investigate "must be
20    considered in light of the strength of the Government's case." *Eggleston v. United States*,
21    798 F.2d 374, 376 (9th Cir. 1986).

22         Considering each allegation of ineffective assistance individually and cumulatively
23    in light of the strength of the Government's case and against the totality of the evidence,
24    the Court concludes Whitney has failed to establish trial counsel was ineffective. Because
25    the strength of the Government's evidence is relevant to the analysis of each individual
26    claim of deficient performance, the cumulative effect of deficient performance, and also
27    integral to the Court's analysis of whether prosecutorial misconduct affected Whitney's
28    substantial rights, as discussed in section III.A.2 below, the Court first addresses Whitney's

argument that the cumulative effect of counsel's errors was prejudicial, and the strength of the evidence that Whitney knew he was transporting marijuana.

### a. Cumulative Effect of Errors

Whitney asserts that counsel's numerous instances of deficient performance were prejudicial, individually and cumulatively.  *See Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (applying cumulative effect analysis to ineffective assistance of counsel claim). The Court disagrees, and concludes that, based on the significant evidence of Whitney's knowing possession of marijuana, there is not a reasonable probability that the result of the proceeding would have been different absent the alleged instances of deficient performance by counsel. That evidence includes the following.

Whitney was driving a truck loaded with 348 wrapped bricks of marijuana weighing 381.8 lbs. Whitney took evasive action to avoid the U.S. Border Patrol checkpoint, slowed his vehicle to avoid Agent Elich who was following him, failed to yield to Agent Elich for several minutes, and provided an unpersuasive reason for failing to yield. Once stopped, Whitney provided contradictory statements to Agents Elich and Consavage regarding his intended destination, and he was unable to provide the name of the business or an address for the location where he picked up the boxes despite having used GPS to navigate there. He also could not provide the address for his brother-in-law's house. He further made inconsistent statements about whether he was in possession of shipping manifests for the unlabeled boxes, which he was ultimately unable to produce even though he testified that paperwork ordinarily accompanied returned items.

Although he was a courier, he didn't know which route was shorter to his destination, and he did not fix his allegedly defective tailgate even though he needed his truck to transport heavy loads.  Additionally, Whitney admitted that he could strap a tire in the bed to prevent a load from shifting onto the tailgate, but he had not done so, and instead transported nine boxes weighing almost 400 pounds in the cab of his truck.

Finally, Whitney's demeanor changed during the encounter.  His hands were shaking as he searched his vehicle for the shipping manifests, which he later admitted that

- 11 -

1  he did not have, and he became tense when he was questioned about the boxes. And, he

2  did not seem surprised or confused that the boxes contained marijuana, but instead

3  defeated.

4        **b. The Route Driven by Whitney**

5        The Court concludes that trial counsel was not ineffective in failing to challenge the

6  Government's assertion that the route Whitney took from Douglas to Whetstone was not

7  the fastest route. Although the route chosen by Whitney was only four minutes slower, the

8  route was slower. (RT 05/25/17 at 79-80; CV Doc. 1-2, Attach. A.) Significantly, the

9  undisputed evidence at trial was that Whitney was inconsistent in identifying his

10  destination. At the time of the stop, he told Agent Elich his destination was Sierra Vista

11  and he told Agent Consavage his destination was Tucson. At trial, Whitney testified that

12  his destination was Whetstone. Whitney also testified that, although he is a courier, he did

13  not know which route was the fastest way to get to Whetstone from Douglas, but he thought

14  he was taking the best route to get there. (RT 5/25/17 at 46.) Given the inconsistencies

15  about his destination and his lack of knowledge as to the fastest route, the Court cannot

16  conclude that trial counsel was unreasonable in failing to highlight that Whitney's chosen

17  route was slower, but only a little slower, than the most direct route. *See Strickland*, 466

18  U.S. at 688 (stating "the proper measure of attorney performance remains simply

19  reasonableness under prevailing professional norms").

20        In addition, even if the chosen route was not "materially" slower, substantial

21  evidence supported the Government's argument that Whitney was selecting his route, with

22  the goal of evading the checkpoint, because he knew there was marijuana in his truck. He

23  abruptly turned left from the right hand lane onto State Route 82 after he saw Agent Agudio

24  at the checkpoint straight ahead. He made the abrupt turn despite the existence of a sign

25  that provided ample notice of the turn onto State Route 82, and the existence of a long left-

26  hand turn lane, which he did not use. This evidence, in addition to the evidence detailed in

27  Section III.A.1.a, was strong circumstantial evidence of Whitney's knowledge. In light of

28  this evidence, Whitney has not shown that he suffered prejudice from counsel's failure to

1  argue that the fastest route was not materially faster.

2         **c.  Dents in the Tailgate**

3       Whitney asserts counsel was ineffective in failing to investigate and document the

4  damage to his truck's tailgate.  Whitney argues this evidence would have supported his

5  testimony that the boxes were in the cab of the truck instead of the bed because the damaged

6  tailgate could open if the boxes shifted against it.  Whitney asserts that the evidence would

7  also have refuted Agent Garbo's testimony that exposure to heat will cause marijuana to

8  give off more odor, which is why the marijuana may have been concealed in an air-

9  conditioned vehicle. (CV Doc. 1-2 at 15-18.)  Whitney argues that counsel's failure left

10  him vulnerable to claims of fabricating evidence.  (*Id*.)  The Court concludes that Whitney

11  fails to show that his counsel's performance was deficient in failing to investigate and

12  document the damage to the tailgate or that he suffered prejudice as a result of the allegedly

13  deficient performance.

14       The "reasonableness of counsel's actions may be determined or substantially

15  influenced by the defendant's own statements or actions" because counsel's actions are

16  based on information supplied by the defendant.  *Strickland*, 466 U.S. at 691.  Here,

17  Whitney does not claim that he told his attorney about the operational issues with the

18  tailgate prior to trial. Whitney appears to have disclosed the issue on the third day of trial

19  when he gave his counsel a photograph he had taken the night before that showed two dents

20  on the tailgate. Whitney produced this evidence after Agent Garbo testified the previous

21  day that exposure to heat will cause marijuana to give off more odor and that's why it may

22  have been concealed in an air conditioned vehicle.

23       Whitney also has failed to show that trial counsel could have discovered the alleged

24  operational defect by inspection absent Whitney telling him about the issue.  Pictures of

25  the vehicle would not establish or corroborate Whitney's testimony that the tailgate could

26  potentially be opened by the shifting of a load; the photos prove only that the tailgate was

27  dented at the time the photos were taken.  Whitney did not testify that the tailgate would

28  not open or close or stay shut; he testified that it was operational, but it "could" pop open.

According to Whitney, the defect was random and unpredictable:  if the weight in the bed were to shift to the back, it "could possibly open [the] tailgate."  (RT 5/25/17 at 76.)  It is unlikely that counsel could discover a randomly occurring defect such as this, absent Whitney alerting counsel to the defect.  Counsel cannot investigate what counsel does not know.  *See Strickland*, 466 U.S. at 689-90 (courts must evaluate reasonableness by eliminating "the distorting effects of hindsight . . . and evaluate the conduct from counsel's perspective at the time").  Thus, the Court concludes that counsel's failure to investigate the operation of the tailgate was not deficient.

In addition, Whitney was not prejudiced by counsel's failure to investigate the alleged operational defect.  There was significant evidence that Whitney put the boxes of marijuana in the cab of the truck so that the marijuana would not be discovered, including Agent Garbo's testimony explaining that the smell of marijuana is enhanced when exposed to heat. Whitney's testimony that the tailgate was defective and that loads in the bed could fall out was also called into question by his admission that the damage to the tailgate occurred in March of 2016, and that he had not repaired the tailgate in the following nine months, even though he primarily used the truck to transport items for his delivery service. It was also called into question by Whitney's testimony that there was a way that he could safely transport loads in the bed of the truck despite the defective tailgate. (RT 05/25/17 at 78.) When asked how he could do his job as a courier, transporting heavy things, with a defective tailgate, Whitney responded that if he was transporting something heavy "like a transmission or an engine, [he] had a tire that could be placed in and strapped to the side so that it doesn't shift around or move around." (RT 05/25/17 at 78.)  Moreover, the jurors might have considered that Whitney never mentioned the defective tailgate or explained why the boxes were in the cab of the truck, either to agents or his attorney, until the third day of trial, after Agent Garbo's testimony. On this record, Whitney fails to show counsel's failure to investigate the tailgate was prejudicial.

### d.  The Flip Phone

Whitney argues that defense counsel was ineffective for failing to investigate and

- 14 -

1    introduce evidence that there were no phone records associated with the flip phone found

2    in his truck on the date of his arrest.  (CV Doc. 1-2 at 22.) Whitney asserts that the lack of

3    phone records would have refuted the Government's argument that the flip phone was

4    being used as a "burner phone" and would have corroborated his testimony that the phone

5    was in the truck for his two-year old son to play with, and the implication from that

6    testimony, that the phone was not operational.  Whitney states that the Government was in

7    possession of, and had, in fact, disclosed to defense counsel, records from T-Mobile

8    showing that the "burner phone" had not been used.  (CV Doc. 1-2 at 21-22.)

9         Whitney is mistaken about the nature of the Government's disclosure.  The T-

10   Mobile record produced by the Government showing no activity pertained to phone

11   number (520) 437-1703. (Doc. 12-1, Attach. A.) That phone number was the number for

12   Whitney's personal phone, not the alleged burner phone. (RT 05/25/17 at 24-25, 28; Ex.

13   103; CV Doc. 12-1, Attach. B.)  According to Whitney, his cell phone provider was Sprint,

14   not T-Mobile.  (CV Doc. 1-2 at 21.) If that was the case, the T-Mobile records did not relate

15   to either the flip phone or Whitney's personal cell phone, and thus would have had no

16   evidentiary value.[2]  Thus, Whitney does not point to any available evidence, including

17   phone records, which counsel could have obtained to corroborate Whitney's testimony that

18   the flip phone was non-operational. Consequently, Whitney fails to show that defense

19   counsel's performance was deficient for failing to find "burner phone" records or to utilize

20   the Government's phone records, which pertained to his personal phone.  *See United States*

21   *v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987) (defendant was not denied effective assistance

---

[2]  The Government also argues that trial counsel made the best decision by not attempting to go into the T-Mobile records because the jury would have heard that there was no recorded activity on the phone that Whitney listed as his contact number on his business flier. (Doc. 12 at 15.)   The Government also contends that the T-Mobile records would have refuted Whitney's claim that Ortiz had contacted him earlier in the day and Whitney's claim that he was receiving 8 to 20 calls per day from prospective customers. (*Id.*)  However, absent further evidence, it is not clear to the Court that the T-Mobile record would have proved a lack of activity on Whitney's personal phone.

There is no evidence that T-Mobile was the service provider for Whitney's personal phone. In his Motion, Whitney claims that his personal phone was a Sprint phone. Moreover, Agent Morando testified that Whitney called someone, whom he said was his brother-in-law, during the stop, and that Agent Morando talked to that individual.  (RT 05/24/17 at 95.)  Thus, it appears that Whitney's personal phone was operational.

1    of counsel for failure to call out-of-state witnesses absent indication of what witnesses

2    would have testified to or how their testimony would change the outcome of the

3    proceeding.) Similarly, Whitney has failed to demonstrate that the alleged deficient

4    performance prejudiced the outcome of his trial.

5                    **e.  The Aerosol Can**

6        Whitney asserts that his trial counsel was ineffective for failing to cross-examine

7    the agents on their failure to document or seize the alleged aerosol can and for not arguing

8    that issue to the jury. (CV Doc. 1-2 at 24.) Whitney argues that as a result, one of the

9    Government's pieces of circumstantial evidence was left unrefuted. (*Id.*) The record does

10   not support Whitney's argument.

11       The record shows that trial counsel challenged the agent's testimony about the

12   presence of an aerosol can and Whitney's use of an air freshener.  During Whitney's direct

13   examination counsel asked "Was there air freshener in the cab? . . . Did you have air

14   freshener in the cab? . . . Did you use air freshener?" Whitney answered each question with

15   "No." (RT 05/25/17 at 37.) During cross-examination of Agent Elich, counsel established

16   that Agent Elich had not collected the alleged aerosol can. (RT 05/24/17 at 51.) Finally,

17   during closing argument, counsel argued to the jury that no evidence of an air freshener

18   can had been produced at trial, and if there was an air-freshener can, it should have gone

19   into evidence. (RT 05/25/17 at 114.) Although counsel did not specifically ask the agents

20   about their failure to document the existence of the can in their report, counsel did attack

21   the agents' claim that Whitney had sprayed air freshener in the truck before the stop and

22   the agents' testimony that an air freshener can existed. On this record, the Court cannot say

23   that counsel's performance was deficient.

24       The Court also concludes that Whitney was not prejudiced by counsel's failure to

25   establish that agents did not document the existence of the can in their report.  Through

26   examination of the witnesses and closing argument counsel clearly challenged the agents'

27   claims about the aerosol can and spray.  Evidence that the agents' report did not mention

28   the can would not significantly buttress counsel's argument.  The Court cannot conclude

that but for counsel's failure to establish that the report did not mention the can, there is a reasonable probability that the result of the trial would have been different.[3]

### 2.  Failure to Present a Defense Theory of Third-party Culpability

Whitney asserts that his trial counsel was ineffective for failing to investigate, prepare, or present a theory that Whitney's brother-in-law, Eduardo Ortiz, was the culpable party and used Whitney as an unknowing courier. (CV Doc. 1-2 at 25.)  Whitney argues that counsel should have interviewed Ortiz, subpoenaed him, or attempted to call him as a witness.  Whitney points to evidence that Ortiz had two prior drug convictions whereas Whitney had none, and evidence that Ortiz was arrested one month after Whitney, under virtually identical circumstances.

The record does not support Whitney's claim that counsel failed to present a defense of third-party culpability. At trial, counsel introduced evidence that Whitney was acting at the direction of Ortiz. Whitney testified on direct examination that Ortiz asked Whitney to cover his route that day and to pick up some returned items from a location in Douglas and bring the items back to Ortiz's house. (RT 05/25/17 at 29, 32.) Whitney further testified that Ortiz provided the address for the location in Douglas. (RT 05/25/17 at 32.) During closing argument, counsel argued that Ortiz was the reason Whitney was going to

---

[3] Whitney, through substitute counsel, supplemented his motion with an Amendment, which the Court denied with leave to refile. (CV Doc. 9.)  Counsel did not make any additional filings.  The Court notes that in the supplement, Whitney argues that counsel was ineffective in failing to request a lost or unpreserved evidence instruction (Ninth Circuit Model Criminal Jury Instruction 4.19).  That instruction provides: "If you find that the government intentionally [destroyed][failed to preserve] [*insert description of evidence*] that the government knew or should have known would be evidence in this case, you may infer, but are not required to infer, that this evidence was unfavorable to the government."

In deciding whether to give instruction 4.19, a court "must balance the quality of the Government's conduct against the degree of prejudice to the accused, where the government bears the burden of justifying its conduct and the accused of demonstrating prejudice." *United States v. Sivilla*, 714 F.3d 1168, 1173 (9th Cir. 2013) (quoting *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979)). The Court finds that the Government's failure to collect the aerosol can did not prejudice the defendant because collecting the can would have only strengthened the Government's case against Whitney. In the absence of a preserved aerosol can, the jury was left to determine the credibility of the Government's witnesses and Whitney.  *See Sivilla*, 714 F.3d at 1173-74 (discussing factors the Court must consider when analyzing prejudice); *see also, e.g., Strickland*, 466 U.S. 668, 691 (noting pursuing certain investigations may be fruitless or even harmful).

1    Whetstone, that Ortiz was going to label the packages, and that Ortiz was going to get the
2    packages to where they were intended to go; he argued that there was no evidence Whitney
3    knew what was inside of the packages. (RT 05/25/17 at 115-117). Counsel asserted that
4    Whitney's "brother-in-law was really . . . his key to all this endeavor[.]" (RT 05/25/17 at
5    117.)

6         Counsel's performance was not deficient for failing to more fully investigate and
7    pursue the theory that Ortiz was the culpable party. Counsel asserted a third party
8    culpability defense to the extent practicable. Counsel provided notice of his intent to call
9    Ortiz as a defense witness, and filed a motion to limit Ortiz's testimony to 1) his hiring of
10   Whitney and 2) his directing of Whitney's actions on the day of his arrest. Counsel also
11   sought to preclude questioning about Ortiz's September 2016 arrest for transporting
12   marijuana. If counsel had obtained favorable rulings, it would have increased the
13   likelihood that Ortiz would have been willing to testify at Whitney's trial.

14        The Court ruled that Ortiz's prior drug trafficking convictions were not admissible
15   for impeachment purposes. (CR 60 at 2.) But the Court also ruled that Ortiz could be
16   questioned about his September 2016 arrest. The Court appointed counsel to represent
17   Ortiz, as Ortiz was facing prosecution for the September arrest and, depending on his
18   testimony, would be exposing himself to prosecution for Whitney's August 2016
19   transportation of marijuana and/or perjury. After the Court's ruling and after counsel was
20   appointed for Ortiz, Whitney's counsel indicated he would not be calling Ortiz as a witness.
21   Ortiz's counsel submitted an affidavit stating that she would have advised Ortiz to assert
22   his Fifth Amendment rights and to not testify in Whitney's trial. (Doc. 12-1, Attach. C.)
23   Notably, Whitney fails to show that his brother-in-law was available and willing to testify,
24   and that he would not invoke his Fifth Amendment rights if called as a witness. *See Berry*,
25   814 F.2d at 1409 (defendant was not denied effective assistance of counsel for failure to
26   call out-of-state witnesses absent indication of what witnesses would have testified to or
27   how their testimony would change the outcome of the proceeding).

28        Moreover, in light of the Court's rulings, Whitney fails to show that his trial counsel

- 18 -

did not employ sound trial strategy in deciding not to call Ortiz as a witness. *See Strickland*, 466 U.S. at 689 (noting that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"). Whitney was facing a charge of conspiracy in addition to the possession charge. The circumstances of Ortiz's arrest were almost identical to those of Whitney's arrest. Ortiz was stopped by Border Patrol at the same checkpoint with seven boxes of marijuana in the backseat and bed of his truck. (CR Doc. 44 at 4.) Ortiz did not have shipping manifests for the boxes and told the agents that he was a courier for car parts and that he didn't know the boxes contained marijuana. (RT 05/17/17 at 24; CR Doc. 44 at 4.) In combination with the other evidence presented by the Government, the jury could have reasonably inferred that Whitney was involved in a conspiracy with Ortiz to possess and distribute marijuana. Whitney has failed to show counsel's performance in presenting a third-party culpability defense was deficient or prejudiced Whitney.

### 3. Failure to Object to, or Move for a Mistrial or Other Relief, Based on Prosecutorial Misconduct

#### a. Witness Vouching

"The rule that a prosecutor may not express his personal opinion of the defendant's guilt or his belief in the credibility of witness is firmly established." *United States v. McKoy*, 771 F.2d 1207, 1210-11 (9th Cir. 1985). "Vouching is especially problematic in cases where the credibility of the witnesses is crucial[.]" *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991). "It is also true, however, that the prosecution must have reasonable latitude to fashion closing arguments." *Id.* "Inherent in this latitude is the freedom to argue reasonable inferences based on the evidence." *Id.* "In a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying." *Id.* (citing *United States v. Laurins*, 857 F.2d 529, 539 (9th Cir. 1988) (statement that defendant was a liar could be construed as a comment on the evidence), and *United States v. Birges*, 723 F.2d 666, 672 (9th Cir. 1984) ("It is neither unusual nor improper for a prosecutor to voice doubt about the veracity

1  of a defendant who has taken the stand.")).

2         With these principles in mind, the Court turns to Whitney's argument that his

3  counsel was ineffective for failing to object to the prosecution's statements that Whitney

4  asserts lacked an evidentiary basis. During the Government's recross-examination of

5  Whitney, the following exchange occurred:

6        Q: You only provided Exhibit 102 to the Government this morning, correct?

7        A: Yes, Sir.

8        Q: Nine months after your arrest. That is not the way your truck looked on

9        the day in question, is it?

10       A: Yes, it was.

11       Q: You put those dents there, did you not?

12       A: No, I did not.

13       Q: What you're doing is you're fabricating evidence; isn't that true?

14       A: No, it is not.

15       . . .

16       Q: The real truth, Mr. Whitney, is that you staged these photographs, correct?

17       A:  What do you mean by staged?

18       Q:  Well, that's you just sitting there, sitting upright in your truck, correct?

19       A:  Correct. I put myself in there as if I was driving.

20       Q:  Right, because you were staging it, correct?

21       A:  I was making it as if I was driving, as relevant to the case.

22       Q:  You went through two days of testimony listening to what other people

23       had to say, correct?

24       A:  Correct.

25       Q:  And then you took a picture and staged it, correct?

26       A:  I took a picture with me in there, yes.

27       Q:  All right. And let me ask you, that rear window is tinted on your vehicle,

28        right?

1    A:  Correct.

2    Q:  Right. If there was somebody in there with a gun or a knife, nobody would

3    be able to see through that tint, right?

4    A:  Not through the back, no.

5    Q:  Right. And not through that side window either?

6    A:  Not through the back side window, no.

7    (RT 5/25/17 at 66-68.) Further, during closing arguments the prosecutor argued:

8
9        Now, nine months later, of course, even though Agent Elich says that he
         never saw any dents in that bed of the pickup truck, now, nine months later,
10       after Mr. Whitney has heard all the testimony that came out in the case, now
         he says, "Oh, yeah, there were dents in there and, you know, I couldn't really
11       use the tailgate. You know, it wasn't safe. It wasn't safe." And yet he is still
12       using his truck to move heavy items and still working for this courier service
         where he knows he has to move these heavy items, but he doesn't get the
13       dents fixed, ever? I mean, it's the same condition, he claims, that it was since
14       March of 2016. He doesn't get his truck fixed? We'd submit to you again
         another fabrication from the defendant. Staged photographs, staged
15       photographs, think about that and let that sink in. Here in a court of law,
16       under oath, staged photographs.

17       You know, there's actually a reasonable explanation why those boxes were
18       in the truck cab. It's because he knew that there was marijuana inside. And
         you remember Agent Garbo's testimony about how heat affects the smell of
19       marijuana and that it causes the smell to increase. So of course the defendant
20       knew about the marijuana in the boxes and he put them in the truck cab,
         because he wanted to get it away from the sun and keep the smell down.
21       That's the reasonable  inference, ladies and gentlemen. That's the reasonable
22       inference from that evidence.

23   (RT 5/25/17 at 99-100.)

24       The Court concludes that the Government had a reasonable foundation for

25   questioning Whitney's veracity.  Whitney produced the photos for the first time on the third

26   day of trial.  Whitney testified that he took the photos the night before, after hearing Agent

27   Garbo's explanation as to why the marijuana would be transported in the cab instead of the

28   bed of a truck. Whitney admitted that he set up the Exhibit 102 photograph by sitting in the

driver's side to be relevant to the case.  And Agent Elich had testified that he did not recall seeing any damage to the tailgate at the time of Whitney's arrest. Notably, although the Government attacked Whitney's testimony that there were dents in the tailgate, the Government's argument was directed to Whitney's claim that the tailgate was at risk of opening.  Whether there were dents in the tailgate was not relevant, in and of itself.  No evidence was provided at trial, or in the pending motion, which corroborates Whitney's claim that the boxes of marijuana were in the cab of the truck instead of the bed because of the tailgate's potential to fail.

In addition, significant evidence supported the Government's argument that Whitney was knowingly transporting marijuana and that Whitney was not being truthful as to his knowing involvement, including evidence that Whitney did not mention the inoperability to anyone until the third day of trial; Whitney's claim that he was a courier, but nonetheless, did not have the tailgate repaired so that he could transport heavy items in the bed; and Whitney's admission that he could strap a tire in the bed to prevent a load from shifting onto the tailgate, but he hadn't done so.  Along with the other inconsistencies, the Court concludes that  the Government's suggestion that Whitney had fabricated the damage to the truck did not affect Whitney's substantial rights. *See United States v. Moreland*, 509 F.3d 1201, 1215 (9th Cir. 2007), *cert. granted, judgment vacated*, 555 U.S. 1134, 129 S. Ct. 997, 173 L. Ed. 2d 289 (2009), and *opinion reinstated in part*, 604 F.3d 1058 (9th Cir. 2010) ("Where the government presented strong independent evidence of the defendant's guilt, a prosecutor's improper statements about the defendant during cross-examination will not be found to have affected the defendant's substantial rights.") (internal quotation marks omitted); *see also United States v. Romero-Avila*, 210 F.3d 1017, 1022-23 (9th Cir. 2000) (finding that a prosecutor's statement did not affect the defendant's substantial rights when "the prosecution presented strong independent evidence of [the defendant's] guilt"). As discussed throughout this order, the Government presented strong evidence that Whitney knew the boxes contained marijuana, and that he did not testify truthfully.  Thus, the Court finds that Whitney's trial and appellate counsel were not

1    deficient for failing to seek relief based on the prosecutor's argument that Whitney was

2    fabricating evidence. *See Birges*, 723 F.2d at 672 (referring to defendant's claim as a

3    "fabrication" was "well within the bounds of acceptable comment").

4         **b.  Alleged Failure to Disclose Photos of Damaged Tailgate**

5         Whitney asserts that the Government failed to timely and voluntarily disclose

6    exculpatory evidence—a Google Maps image that showed damage to the tailgate of

7    Whitney's truck—which would have corroborated his assertion that the dents were there

8    at the time of his arrest. However, the record shows that, at the time of the trial, the

9    Government was not aware of the Google Maps image. (RT 08/4/17 at 11.)   The

10   Government did not look at Google Maps until after trial, after Whitney's surprise

11   production of photographs of the truck and his testimony that the tailgate was not

12   operational in August 2016.

13        Whitney also argues that the Government should have disclosed the Google Maps

14   image as soon as it became aware of it so that he could move for a new trial, and that it

15   may have provided grounds for a downward variance at sentencing. (CV Doc. 1-2 at 31).[4]

16   The Court finds that this allegation is without merit, and that counsel was not deficient for

17   failing to seek relief on this basis. While the Google Maps image would have corroborated

18   Whitney's claim that the tailgate was dented, it could not have corroborated his testimony

19   that the tailgate did not function properly, which was why the boxes were in the cab of the

20   truck instead of the bed.  In light of the substantial evidence that Whitney was knowingly

21   transporting marijuana, the Court concludes that the image would not have provided a basis

22   for granting a new trial.  Further, Whitney's argument that the disclosure of the image

23   would have provided a basis for a variance is unsupported and conclusory. *See Strickland*,

24   466 U.S. at 689 (noting there is "a strong presumption that counsel's conduct falls within

25   the wide range of reasonable professional assistance," and defendant has "the burden of

26   ───────────────
        [4] At sentencing, in response to a question from the Court, the prosecutor stated that
27   after trial he found a Google Maps image that suggested that the tailgate may have been
     damaged prior to Whitney's arrest, as Whitney testified. The prosecutor contended that the
     fact of the damage misses the major point, which is that there is no evidence that the
28   damage to the truck hindered the operability of that tailgate in any way, which was what
     Whitney was saying at trial. (RT 08/04/17 at 11.)

showing" prejudice). The Court sees no basis for granting a variance based on the Google Maps image showing a dent in Whitney's tailgate.

### 4.  Overall Failure to Advocate

Whitney argues defense counsel was ineffective for an overall failure to advocate, and lists various claims of ineffective assistance of counsel.  Reviewing the claims, the Court concludes that  Whitney fails to meet his burden of proving ineffective assistance of counsel.

With respect to the stipulated admission of all the Government's exhibits, Whitney argues that this is highly unusual.  However, stipulations do "not necessarily demonstrate incompetency of counsel." *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1254 (9th Cir. 1986). Additionally, "a defendant must show that [the errors] actually had an adverse effect on the defense." *Strickland*, 466 U.S. at 693. Whitney has not done so.

Whitney also fails to show how counsel's alleged unfamiliarity with the applicable rules constituted deficient performance and/or prejudiced him. The fact that an objection was overruled cannot, in itself, constitute deficient performance or prejudice. The same is true with counsel's mistake in asking an expert witness a factual question about the case. In fact, counsel was later able to introduce the relevant factual information via an appropriate witness.

As it pertains to counsel's alleged failure to cross-examine Government witnesses about the fact that Whitney had chosen the route with the open checkpoint, Whitney's testimony was that he was not sure if it was open or closed, which is the pertinent issue for knowledge purposes. (RT 05/25/17 at 30-31.) Further, both Agents Morando and Agudio testified that the checkpoint on State Route 90 was initially open, but closed later that afternoon. (RT 05/23/17 at 57; RT 05/24/17 at 65.) The evidence established that the State Route 90 checkpoint was closed when Whitney was returning to Whetstone.  Accordingly, counsel's performance was not deficient, and Whitney did not suffer prejudice.

Whitney asserts that defense counsel failed to elicit a complete version of the facts from Whitney. (CV Doc. 1-2 at 34.) Whitney fails to show that it would be reasonably

probable that the proffered self-serving statements would have changed the verdict, especially in light of the other evidence pointing to Whitney's knowledge that he had marijuana, which Whitney also contested and was rejected by the jury as evidenced by the verdict. In fact, much of the information that Whitney asserts should have been elicited by counsel was later provided when asked by the jury.

## IV.   Certificate of Appealability

Before Petitioner can appeal this Court's judgment, a certificate of appealability (COA) must issue. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b)(1); Rule 11(a) of the Rules Governing Section 2255 Cases. "The district court must issue or deny a certification of appealability when it enters a final order adverse to the applicant." Rule 11(a) of the Rules Governing Section 2255 Cases. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." The court must indicate which specific issues satisfy this showing. *See* 28 U.S.C. § 2253(c)(3). With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a COA will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.* Applying these standards, the Court concludes that a certificate should not issue, as the resolution of the petition is not debatable among reasonable jurists.

## V.   Conclusion

Having presided over the trial, the Court is familiar with the presentation of evidence in this case. In considering Whitney's motion, the Court acknowledges, as Whitney argues, that his attorney could have done more. However, the Court does not conclude that counsel's performance was deficient under the *Strickland* standards, i.e., that counsel made errors so serious that performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688. Nor does

the Court find that, considering the totality of the evidence, "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694-95.

Thus, for the foregoing reasons,

**IT IS ORDERED** Petitioner's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. 100) is **DENIED**, and the civil action opened in connection with this Motion (CV-18-00618-TUC-JGZ) is **DISMISSED** with prejudice. The Clerk of Court must enter judgment accordingly.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **DENIED**.

The Clerk of Court is directed to close its file in this action.

Dated this 2nd day of August, 2021.


Honorable Jennifer G. Zipps
United States District Judge